BAYLIES R. CHACE *vs.* CITY COUNCIL OF PROVIDENCE.

MARCH 23, 1914.

PRESENT:    Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

*(1)  Mandamus.  Municipal Officers.  Inspection of Milk.*

Gen. Laws, 1896, cap. 147, § 2, made obligatory the election of an inspector of milk in the city of Providence, by the mayor and aldermen.

By Pub. Laws, cap. 333, passed May 13, 1896, provision was made for the employment of collectors of samples by such inspector, subject to the approval of the mayor and aldermen, vesting authority in the inspector to discontinue the employment of any collector at any time.  The collector was to be engaged before the city clerk and a record kept thereof and was to receive such salary as the mayor and aldermen should determine.

Pub. Laws, cap. 785, passed May 31, 1900, provided that the inspector of milk of the city of Providence might appoint subject to the approval of the mayor and aldermen two collectors of samples with authority to dismiss them at any time and subject to the same approval appoint others, and in other respects conformed to the former act, and these provisions have been reënacted as Gen. Laws, 1909, cap. 173, § 9.

*Held*, that the mayor and aldermen of the city of Providence exercise the powers of a local board of health, and the election of inspectors of milk and

collectors of samples by the board of aldermen was authorized for the purpose of assisting such local board in the discharge of its duties within its respective locality, and such officers were primarily municipal rather than state officers, and as between the inspector and collector the latter was a mere employee without definite tenure of office and might be removed without cause at the pleasure of the former:—

*Held*, further, that the inspector of milk and collectors of samples of the city of Providence were "officers" of the city within the words of the charter "the administration of all the fiscal, prudential and municipal affairs of said city with the conduct and government thereof, shall be vested in (the mayor, aldermen and common council), together with such other magistrates or *officers*, as are hereinafter specified or by the laws of this State or the ordinances of the city are or hereafter may be, authorized or prescribed," and therefore they were subject to removal under Sec. IX, clause 9 of the charter, "The city council may by a concurrent vote, two-thirds of the members elected to either board voting in the affirmative, remove all officers for misconduct or incapacity."

*Held*, further, that the power of dismissal given to the inspector over the collector was not in conflict with or exclusive of the power of removal vested in the city council.

*Held*, further, that where charges preferred against a collector of samples were of a serious character, sufficient if proved to warrant his dismissal from office, the city council, having the power of removal, had also the power to suspend the officer pending the investigation of the charges against him.

*(2) Mandamus. Public Officer.*

Mandamus is appropriate to compel the restoration to office of a rightful incumbent who has been wrongfully removed.

*(3) Municipal Officers. Dismissal. Certiorari.*

Charges were filed against a collector of samples of milk before the city council of the city of Providence and a joint committee was appointed to hear the evidence and report it with its findings. The committee heard the testimony, the accused being represented by counsel and given an opportunity to present his defence and reported the evidence with its findings to the council which received the report and the accused was given an opportunity to appear before the council and show cause why he should not be removed from office, of which he did not avail himself.

*Held*, that the method was a reasonable and proper one of gathering the evidence and bringing it before the council for its consideration and determination, and there was no delegation of power to the committee to try the accused, but his removal was by act of the council upon the evidence after full opportunity to him to appear and be heard before it.

MANDAMUS.    Heard on appeal from judgment of Superior Court and appeal dismissed.

CERTIORARI.    Heard on petition for writ and denied.

PARKHURST, J.   These are two cases between the same parties; and although they were argued at different times, the questions arising in both cases are so closely related and interwoven that, for convenience, we shall consider and determine both cases in one opinion.

The first case is an appeal from the judgment of the Superior Court denying and dismissing the petition of Baylies R. Chace for a writ of mandamus to compel the defendant members of the city council of the city of Providence to convene and to remove the suspension of said Chace from the office of collector of samples of milk and to restore him to said office, from which he had been suspended by the following joint resolution of said city council, passed on July 8, 1913:

"Resolved, That Walter O. Scott, Inspector of Milk, and Baylies R. Chase, Collector of Samples, of the city of Providence, be and they hereby are severally suspended from their said respective offices, such suspensions to continue in effect from the date of the passage hereof and until the hearings on the pending charges against said officers respectively shall have been had and the city council shall have taken final action relative to such respective charges.

"And that the superintendent of health of the city is hereby authorized and directed during the period of said suspension of said inspector of milk to supervise the quality of milk sold and delivered in the city of Providence, and to take any lawful steps necessary to prevent and restrain the sale of adulterated milk or milk below the required standard and deemed adultered under Chapter 173 of the General Laws, entitled 'Of Milk,' and said superintendent is hereby authorized to cause all samples of milk collected by any officer of the city, or by any person employed by said superintendent to obtain specimens of the milk being supplied in the city, or received by said superintendent from any residents of the city to be tested and analyzed, and to notify

the chief of police of all violations discovered by him in said Chapter 173 of the General Laws; and said superintendent may use any property of the city used by or in charge of the inspector of milk; and the expenses of said superintendent hereunder shall be charged to the appropriation for the health department.

"And that the city clerk is hereby directed forthwith upon the passage hereof to cause copies hereof, duly certified by him, to be served by the city sergeant upon said Walter O. Scott and Baylies R. Chace severally."

Said charges are specified in papers accompanying a joint resolution of said city council, also passed July 8, 1913, entitled "Resolution Creating a Joint Special Committee with Certain Powers and Duties Relative to Charges Against Members of the Milk Department of the City," which resolution reads as follows:

"Resolved, That the Mayor and Aldermen Moulton and Kelso of the board of aldermen, designated by the Mayor, and Messrs. Harden, Phillips and Berth of the common council, designated by the president thereof, be and they hereby are appointed a joint special committee of the city council, with the following powers and duties. Said joint special committee shall hear and receive the evidence presented in support of and against the accompanying charges against two officers of the milk department of the city, namely, Walter O. Scott, Inspector of Milk, and Baylies R. Chace, Collector of Samples, which charges, as recommended by the committee on milk to the board of aldermen, have been formulated by the law department; and said joint special committee shall cause said evidence to be taken stenographically, transcribed and with any documentary, book or other exhibit evidence in any form received by said committee to be filed with either branch of the city council, and therewith said committee shall submit to the city council its report relative to such charges and evidence, its findings thereon and its recommendations, for such further action as the city council may determine. Said

committee may cause the transcribed evidence to be printed, and printed copies thereof to be also filed as aforesaid for the use of the city council, and may make its report in print.

"In case pending such proceedings any further or other charge or charges shall be made to said committee by any citizen or citizens of the city against said inspector or said collector, or any other member of the milk department, said committee in its discretion may also investigate as to such charge or charges, after giving the accused reasonable notice thereof, and in such case shall also submit the evidence relative thereto and its report thereon to the city council as aforesaid.

"Such officer or officers of the law department as designated by the city solicitor shall prosecute said charges before said joint special committee; and any expenses of said joint special committee relative to its duties hereunder on the approval of its chairman, and the expenses of the law department incident to summoning witnesses, investigating any relevant matters or otherwise relative to prosecuting the charges, on the approval of the city solicitor, shall be paid from the balance of the appropriation made by resolution No. 217, approved May 22, 1913, and any amount of any such expenses in excess thereof from the appropriation for the city council. Forthwith upon the passage of this resolution, the city clerk or one of the deputy city clerks shall cause copies hereof and of the accompanying charges, duly certified by him, to be served by the city sergeant upon said Walter O. Scott and Baylies R. Chace severally, and on Monday, July 14, 1913, at 10 o'clock A. M., at the council chamber, city hall, said committee shall convene, and proceed with the performance of its duties hereunder."

The city sergeant of said city on July 8, 1913, duly served copies of both said resolutions, and of said charges, duly certified by the city clerk of said city on said Scott and Chace severally.

Said charges allege grave dereliction of duty on the part of both said Scott and Chace, and include charges against said Chace that he had received money graft or bribes, and are serious, substantial and specific.

Immediately after the passage of said resolutions and notice thereof and of said charges, said Chace filed this petition, which was denied by a judge of the Superior Court after hearing evidence and argument; a decree was entered denying and dismissing the petition and an appeal to this court was duly claimed and prosecuted, and is now before this court.

The petition sets forth the appointment of the petitioner to the office of collector of samples of milk by Scott, the inspector of milk, and that he was at the time of the passage of the above quoted resolutions suspending him from office, to wit, on the 8th day of July, 1913, and for a long time prior thereto, a duly qualified collector of samples of milk for the city of Providence and was and had been for a long time discharging the duties of said office. It then sets forth the passage of the above quoted joint resolution of suspension, and alleges that the city council has deprived the petitioner of his office room, books, papers, records, etc., and has prevented and still prevents him from exercising the duties of his office.

Said petitioner then sets forth his contentions, as follows:

"FOURTH. And your petitioner further shows that the office of collector of samples of milk, of which he is the incumbent duly appointed by the milk inspector of the city of Providence, by virtue of Chapter 173, General Laws, Rhode Island, 1909, is a State or public office, and not a city or corporate office, and your petitioner as such collector of samples of milk under and by virtue of Section 9, cap. 173, General Laws of Rhode Island, 1909, is a State or public officer, and not a city or corporate officer, and he avers that said city council was not only without authority, but wholly without jurisdiction to act in the premises.

"FIFTH.   Your petitioner further shows that said common council did not elect or appoint your petitioner to his said office, nor participate in his election or appointment, and they had no lawful right, power or authority to join with the board of aldermen in said purported suspension of your petitioner as above set forth.

"SIXTH.   And your petitioner alleges that the matter of said purported suspensions was not within the jurisdiction of said city council."

Petitioner then alleges service upon him of a certified copy of said joint resolution of suspension, and the filing by him of a protest, in writing, addressed to said city council, on the ground that said council was without lawful authority or jurisdiction in the premises, and prays for a writ of mandamus as above set forth.

The city charter contains the following provisions:

SECTION II.   "*Clause 1.*   The administration of all the fiscal, prudential and municipal affairs of said city, with the conduct and government thereof, shall be vested in one principal officer to be styled the mayor; one council of ten persons to be styled the aldermen; and one council of forty persons to be styled the common council; together with such other magistrates or officers as are hereinafter specified, or by the laws of this State or the ordinances of the said city are, or hereafter may be, authorized or prescribed.

"*Clause 2.*   The mayor, aldermen, and common council, in their joint capacity, shall be styled the city council."

SECTION VIII.   "*Clause 1.*   The mayor and aldermen shall exercise the executive powers of said city generally, and the administration of police; together with such other powers as now are, or hereafter may be, conferred upon them by the laws of this State or by the ordinances of the city council."

SECTION IX.   "*Clause 1.*   The city council of said city shall have power to make laws, ordinances and regulations for the government of said city, relative to"   .   .   .   "the

police  department"  .  .  .  "the  public  health,"  etc.
.  .  .

"*Clause 4.*   The city council shall have power to appoint
.  .  .  "an officer to be styled the chief of police, and to
prescribe  his  duties  and  fix  his  compensation."  .  .  .

"*Clause 9.*   The city council may by a concurrent vote,
two-thirds of the members elected to either board voting in
the affirmative, remove all officers for misconduct or incapac-
ity."  (See Charter and Special Laws, City of Providence,
1901, pp. 1-*et seq.*)

Prior to 1798, by the laws of this State, the town councils
of the respective towns were authorized "to make and
prescribe such orders and regulations as they may deem
prudent and advisable, for the preservation of the health
of the inhabitants," etc. (See Revision of 1798, p. 344,
Sec. 19.)

In Rev. Stat. 1857, Chap. 34, § 11, p. 100, it is provided
as follows: "Sec. 11.   The several town councils and
boards of aldermen shall be *ex officio* boards of health in
their respective towns, and may make such rules and regula-
tions not repugnant to law, as they shall judge proper, for
the preservation of the health of the inhabitants thereof,"
etc.

These provisions have been substantially reënacted in
every subsequent revision and have remained in force
down to the present time, and now appear in Gen. Laws,
1909, Chap. 50, § 13, p. 232, and under said provisions,
and by virtue of the city charter Section VIII.   Clause 1,
above quoted, the mayor and aldermen of the city of Provi-
dence have always acted as the board of health of the city
of Providence, and have been so designated in its official
manual down to the present time.

By act of the General Assembly, c. 829, passed March
14, 1870, it was provided that "the mayor and aldermen
of any city, and the town council of any town, may annually
appoint one or more persons to be inspectors of milk for
their respective places," etc., providing for giving public

notice of appointment "in the city or town," for keeping an office and record of dealers in milk "within their limits;" and for taking specimens of milk and for analysis; and for various penalties for sale of adulterated milk, etc. This act has passed through the various subsequent revisions of the statutes, and remained, with some changes and additions, a general permissive act as to all cities and towns, until the enactment of General Laws, 1896, Chap. 147, § 2, which provided as follows: "Sec. 2. The mayor and aldermen of any city, and the town council of any town, may annually elect one or more persons to be inspectors of milk therein, who shall be engaged to the faithful discharge of the duties of their office. Every such inspector shall give notice of his election by publishing notice thereof for two weeks in some newspaper published in the city or town for which he shall be appointed; or, if no newspaper be published therein, by posting up such notice in two or more public places in such city or town: *Provided*, that the mayor and aldermen of the city of Providence shall annually, in the month of August, elect such person or persons to be inspectors of milk and may, at any time during the year thereafter, fill by election any vacancy occurring by reason of death, resignation, absence from the city, or inability to act." By this act the election of an inspector of milk in the city of Providence became obligatory. Certain changes in this section, which are not important to the present consideraration, have been made by subsequent revision, the latest change being that providing for biennial elections. (See Pub. Laws, Jan., 1912, Chap. 863.) (See Gen. Laws, 1909, Chap. 173, Sec. 8.)

It may be noted here that, since the provisions last above quoted, for the election of inspectors of milk, were obviously passed with a view to the preservation of health, it was most appropriate that the election of such inspectors should be confided to the respective town councils and boards of aldermen, which, as we have already seen, were and are *ex officio* local boards of health in their respective towns and

cities, thereby giving them power to elect a special health officer for the purpose of assisting them in the more efficient performance of one of their most important duties, *viz.*: in regulating the sale of milk and preventing the sale of adulterated milk.

Another step in the same direction was the provision for the employment of collectors of samples by such inspectors. This was brought about under Chap. 333, Pub. Laws of R. I., passed May 13, 1896, the first section of which reads as follows: "Section 1. Any inspector of milk of any town or city now in office or hereafter elected under authority of Chapter 147 of the General Laws, entitled 'Of Milk,' or of any act in amendment thereof, may employ, subject to the approval of the town council or the mayor and aldermen, one person as collector of samples, who shall have the same powers and be subject to the same duties and liabilities provided by law relative to the taking of specimens or samples, as an inspector of milk. All specimens or samples taken and retained by any such collector shall be delivered to such inspector, who shall have the same powers and duties relative to the same as in case of specimens or samples taken by himself. Such inspector at any time may discontinue the employment of any such collector, and subject to the approval aforesaid, employ another person in his stead. Such collector upon being employed shall be duly engaged to the faithful discharge of his duties before the city or town clerk, who shall keep a record thereof; and shall receive such salary as the mayor and aldermen or town council shall determine."

Special provision for the city of Providence was later made by Pub. Laws, Chap. 785, passed May 31, 1900, as follows: "Section 1. Any inspector of milk in the city of Providence now in office, or hereafter elected under authority of Chapter 147 of the General Laws, entitled 'Of Milk,' or of any act in amendment thereof or in addition thereto, may appoint, subject to the approval of the mayor and aldermen of said city of Providence, two persons as

collectors of samples, each of whom shall have the same powers and be subject to the same duties and liabilities provided by law relative to collectors authorized by the provisions of Chapter 333 of the Public Laws, entitled 'An act in amendment of and in addition to Chapter 147 of the General Laws, entitled 'Of Milk,' passed at the January Session, A. D. 1896.' All specimens or samples taken and retained by any such collector shall be delivered to such inspector, who shall, have the same powers and duties relative to the same as in case of specimens or samples taken by himself; such inspector may at any time dismiss any such collector, and, subject to the approval aforesaid, appoint another person in his stead. Each such collector, upon appointment, shall be duly engaged to the faithful discharge of his duties before the city clerk of said ·city, who shall keep a record thereof, and shall receive such salary as the mayor and aldermen of said city shall determine."

These provisions now appear without substantial change, in Gen. Laws, R. I., 1909, Chap. 173, § 9.

(2)   That a proceeding by way of petition for a mandamus is appropriate to compel the restoration to office of a rightful incumbent who has been wrongfully removed is amply supported by authority cited on behalf of the petitioner and is not questioned on behalf of the respondents. We see no occasion therefore to discuss this question. The sole question to be determined in this first case is whether, in view of the laws of this State, as above set forth, the city council of the city of Providence had the power to suspend the petitioner as collector of samples of milk from his office, pending the investigation of charges against him, by its resolution as above set forth.

The second case is an original petition in this court for a writ of certiorari. The petition sets forth the appointment and qualification of the petitioner as a collector of samples of milk, in somewhat greater detail, but substantially as above set forth, and his continuance in office until July 8, 1913, and his then exclusion from his office; the presentation

of the charges, already referred to, to the mayor on July 7, 1913, and the convening of the city council by the mayor on July 8, 1913, in special session for consideration of and action upon said charges; the presentation of said charges to said city council, at that meeting, and the passage of the joint resolution appointing the joint special committee on July 8, 1913, which said joint resolution has been hereinbefore fully set forth; that pursuant thereto the committee sat, from time to time, and heard and took evidence upon said charges, and on December 26, 1913, reported to the city council, and in their report found the petitioner guilty of misconduct in his official capacity and recommended that he be dismissed from his office. The petition further shows that on December 26, 1913, the city council voted to receive said report and on the same date passed a joint resolution, as follows:

"*Resolved,* That Baylies R. Chace, Collector of Samples, be and he hereby is required to appear before the city council of the city of Providence on Tuesday, the thirtieth day of December, 1913, at seven o'clock P. M. in the chamber of the common council, city hall, and show cause why, relative to the charges against him accompanying the joint resolution of said city council No. 281, approved July 8, 1913, entitled 'resolution creating a joint special committee with certain powers and duties relative to charges against members of the milk department of the city,' and the proceedings of said committee and the evidence presented before said committee in support of and against said charges, and the report made by said committee to said city council on the twenty-sixth day of December, 1913, a copy of which report is hereunto annexed, he should not be removed from his said office of collector of samples of said city.

"And that said Baylies R. Chace be notified hereof by the city clerk causing a copy hereof with a copy of said report, duly certified by him, to be served by the city sergeant as soon as may be upon said Baylies R. Chace

by leaving the same with him or at his last and usual place of abode with some person living there."

The petition further shows that the petitioner, after being cited by said resolution to appear, protested in writing to said city council against its proposed action "for the reasons that he is a State or public and not a city or corporate officer, and that said city council is without jurisdiction in the premises."

The petition further shows that, December 30, 1913, the city council passed in concurrence the following resolution:

"*Resolved*, That after considering the evidence presented relative to the charges against Baylies R. Chace, Collector of Samples of Milk, accompanying joint resolution of the city council No. 281, approved July 8, 1913, the city council finds:

"FIRST, that although the allegations of said charges numbered 1, 2, 3 and 4 are proven, yet being in effect charges of negligence, and said Chace as such collector having acted under the general directions of his superior officer, he is not considered to be sufficiently responsible to be held guilty of misconduct therefor;

"SECOND, that said Baylies R. Chace is guilty of the misconduct stated in said charges numbered 5, 6, 7 and 8, copies whereof and of the bill of particulars to the same respectively being hereunto annexed;

"*And Further Resolved*, That, said Baylies R. Chace being guilty of the misconduct specified in said charges numbered 5, 6, 7 and 8, and in view thereof not being a fit person to hold said office of collector of samples, said Baylies R. Chace be and he hereby is removed from his said office of collector of samples of milk of the city of Providence;

"*And Further Resolved*, That said Baylies R. Chace be notified hereof by the city clerk causing a copy hereof, duly certified by him, to be served by the city sergeant as soon as may be upon said Baylies R. Chace by leaving the same with him or at his last and usual place of abode with some person living there."

The charges and specifications upon which petitioner was so found guilty are stated in full in the petition and were annexed to the last quoted resolution; they consist of a corrupt proposition to a former inspector of milk involving prospective protection to milkmen and prospective collection of graft; and various charges of the receipt and collection of money graft or bribes from various named parties at different times during petitioner's incumbency of office; petitioner admits service upon him of a certified copy of said resolution and charges, December 31, 1913. He further alleges that he did not attend said meeting of the city council on December 30th when he was given an opportunity to appear and be heard; that no testimony was taken or presented at that meeting in relation to said charges; that all such testimony was taken before said committee and that there never has been any such testimony taken or presented by or before two-thirds of the said city council; petitioner then sets forth certain clauses of the city charter already herein set forth and referred to, and reiterates his claim that under the law of his appointment "his said office of collector of samples of milk is a State or public office, and not a corporate or municipal office," and that petitioner is a "State or public officer, and is not an officer of the city of Providence;" and in conclusion claims that the city council was without jurisdiction to remove him from office and prays for a writ of certiorari to bring up the record of said city council relating to the matter of his removal to the end that the same may be quashed.

It thus appears that three principal questions are raised: 1. Did the city council on July 8, 1913, have the power to suspend the petitioner from his office? 2. Did said city council, on December 30, 1913, have jurisdiction to remove the petitioner from his office? 3. As subsidiary to the second question, if the city council did have the power to remove, had it taken the proper procedure for his removal?

It may be conceded at the outset, that nowhere in the law have we found any power conferred upon the city council

in express terms to suspend the petitioner from his office. If such power exist, then, it must be as incident to the power to remove. The primary question, therefore, is as to the power to remove.

The broad claim of the petitioner that he is a "State or public officer" and not a "corporate or municipal officer," and that therefore the city council under its charter powers had no jurisdiction or authority over him, is not supported by authority, and is not in accord with the reasonable construction of the laws above cited. As we have seen above, boards of aldermen and town councils have from very early times been expressly authorized to act as local boards of health; and the mayor and aldermen of the city of Providence, composing one board (Charter, Section IV.) and exercising "the executive powers of said city generally, and the administration of police; together with such other powers as now are, or hereafter may be, conferred upon them by the laws of this State," . . . (Charter, Section VIII.) have for many years exercised the powers of a local board of health within and for the city of Providence. In the case of *Pope Mfg. Co.* v. *Granger*, 21 R. I. 298, 301, this court said: "The board of aldermen is *ex officio* the board of health for said city. Gen. Laws, R. I., cap. 40, § 13. As a board of health they have sole charge of all matters within their jurisdiction, and when an appropriation has been made to enable them to discharge their duties, we fail to see any reason why they may not lawfully contract bills, in their discretion, to be paid out of such appropriation. They are sworn officials of the city; they constitute an important branch of the city government and are charged by law with the discharge of very important duties, especially when acting as a board of health, and it is certainly to be presumed that they will intelligently and faithfully perform such duties; and unless it clearly appears that a given act, like the one in question, is either beyond their jurisdiction or is a palpable abuse of their discretion, it is binding upon the city and cannot be questioned in a court of law. In the

case at bar the purchase was made by authority of a committee of the board of health; the bill was approved by said committee, by the superintendent of health, and also by the board itself; and there was money subject to the control of said board sufficient to pay the bill."

By reference to the various provisions of the statutes above quoted, whereby the offices of "inspector of milk" and "collector of samples of milk" were respectively created, it appears quite obvious that the election of these officers by town councils and boards of aldermen was authorized by the General Assembly for the purpose of assisting such local boards of health in the discharge of their duties in the important matter of regulating the sale of milk and its quality within their respective localities. The fact that the proper and efficient inspection of milk in the city of Providence, by means of which this most important article of food may be kept pure and healthful, within the city, is incidentally of interest to the inhabitants of the State who may happen to come into or sojourn within the city, or the fact that the preservation of the public health of one political division of the State is beneficial to the public at large, does not render either the inspector of milk or the collector of samples a "State or public officer" in any such sense as claimed by the petitioner. Such officer is primarily and essentially a local or municipal officer, and an assistant or servant of the local board of health. Each town and city is authorized to have its own inspector of milk appointed or elected by its local board of health and such local boards of health and their inspectors are entirely independent of each other and discharge purely local functions, having no jurisdiction outside their respective towns and cities. The collector of samples of milk is appointed by the inspector subject to the approval of the town council or of the mayor and aldermen, and is merely the assistant of the inspector, who may at any time revoke his appointment. As between the inspector and the collector, the latter is a mere employé or assistant without definite tenure of office, and may be

removed at the pleasure of the inspector; no cause need be assigned.

The petitioner apparently relies upon several cases in this state as authority for his position that he is a·"State or public officer," but these cases do not support his position that such an officer may not be removed from office by action of the municipal authorities. The case of *Gainer* v. *Dunn,* 29 R. I. 232, 234, holding that the board of canvassers of the city of Providence is a "board of State officers exercising a State function rather than a board of municipal officers exercising a municipal function," was considering the powers and jurisdiction of the board under a very elaborate special act creating the board and defining its powers and duties and its relation to elections; and had no relation to the question of the removal of any member of the board from office. The case of *City of Newport* v. *Horton,* 22 R. I. 196, had to do with the constitutional right of the General Assembly, in the exercise of the general police power of the State, to impose upon a municipality a police commission appointed by State authority. It had no relation to the question of the power of removal; by the act establishing a board of police commissioners for the city of Newport (Chap. 804, Pub. Laws, R. I., May 31, 1900), the board was to be appointed by the governor, with the advice and consent of the senate, and it was provided in the first section that, "The members of said board may be removed by the governor, with the advice and consent of the senate, for such cause as he shall deem sufficient and shall express in the order of removal." It thereby became plain that the General Assembly intended that the Newport board of police commissioners should be appointed by and be amenable to State rather than to municipal authority. (See, also, *Horton* v. *City. of Newport,* 27 R. I. 283; *The Newport Police Commission,* 22 R. I. 654, 657).

It may be of interest to note at this point, in view of petitioner's reference to the Providence Police Commission, that the General Assembly, November 22, 1901, passed an

act (Chap. 930) to establish a board of police commissioners for the city of Providence, substantially like the Newport act, vesting the appointment of the three commissioners in the governor, with the advice and consent of the senate, and providing for their removal "by the governor, with the advice and consent of the senate, for such cause as he shall deem sufficient and shall express in the order of removal." This act remained in force until April 6, 1906, when by Chap. 1379, the law was so amended as to vest the appointment of such commissioners in the mayor, subject to the approval of the board of aldermen; and providing that, "The members of said board may be removed by said mayor, subject to the approval of said board of aldermen, for such cause as he shall deem sufficient and shall express in the order of removal." The powers and duties of the board of police commissioners are not substantially changed, and the board remains just as much a board of state officers as ever, but the power of appointment and removal has been vested in a municipal board.

Petitioner also cites a number of cases which are referred to and approved in the Newport cases and which are to the same general effect; but in none of them is the question of the power of removal considered. The action of the General Assembly in the matter of the Providence Police Commission in first taking the administration of police out of the hands of the city authorities and afterwards restoring it to the mayor and aldermen, shows a legislative recognition of the wisdom of the policy, which is most common, of delegating the control of boards of police commissioners and the administration of police, including appointments and removals, to municipal authorities; as was in fact originally done by the charter of this city above referred to in Section VIII Clause 1, and Section IX Clause 1, above quoted. It may be here noted also, that by the terms of the charter, Section IX Clause 4, the city council was empowered "to appoint an officer to be styled the chief of police and to prescribe his duties and fix his compensation;" and in clause

9 of the same section the city council is empowered by a concurrent vote, two-thirds of the members elected to either board voting in the affirmative, to "remove all officers for misconduct or incapacity." It will not be questioned that the chief of police is a state or public officer in the sense in which the term is used in *Horton* v. *City of Newport*, 22 R. I. 196, 204, and yet the General Assembly saw fit to delegate the power of appointment and removal of the chief of police to the city council by the express terms of the charter. In the case of *Norton* v. *Adams*, 24 R. I. 97, the court had under consideration Chap. 964 of Pub. Laws, R. I., passed February 21, 1872, under which the town council of East Providence was authorized, among many other things, "to provide for a day and night police," and was also empowered to "remove all officers" appointed by the council, "for misconduct or incapacity, at any regular meeting." Pursuant to such authority an ordinance was adopted providing for a police force and a chief of police; it was held that this chief of police, appointed under the ordinance, "was not a mere police constable, but a member of a paid force, similar to those in cities, and the office of chief of police was thereby made a new and distinct town office." It will be noted that the enabling act Chap. 964 nowhere mentions a chief of police; yet it was not questioned in the case that the power of removal of "all officers" applied to the "chief of police;" but it appeared that no charges against him had been made and no opportunity given him to be heard, and so it was held that the attempted removal by the town council was illegal. We are of the opinion that, in the last cited case, it was perfectly clear and unquestionable that the power of removal of the chief of police by the town council was clearly delegated by the statute above quoted; just as we hold that it is equally clear that in the charter of the city of Providence as above quoted the power of removal of the chief of police was originally delegated to the city council, under the words "all officers." The petitioner stands in no better position

under the charter of the city of Providence, than did the chief of police under that charter, or the chief of police in East Providence in *Norton* v. *Adams, supra.* It has been seen that under the charter Section II, Clause 1, above quoted, "The administration of all the fiscal, prudential and municipal affairs of said city, with the conduct and government thereof, shall be vested in one principal officer to be styled the mayor; one council of ten persons to be styled the aldermen; and one council of forty persons to be styled the common council, together with such other magistrates or *officers* as are hereinafter specified, or *by the laws of this State or the ordinances of the said city are, or hereafter may be, authorized or prescribed.*"

It is quite plain that when, under the statutes above quoted, provision was made in 1870 for the appointment of inspectors of milk, and later in 1896, such appointment of an inspector or inspectors of milk was made obligatory upon the mayor and aldermen of Providence, and that when, in 1896, provision was also made for the appointment of collectors of samples, and those appointments were made, the inspector of milk and his collectors of samples so appointed in the city of Providence became officers of the city within the words of the charter last above quoted, being "officers" . . . "by the laws of this State" . . . "hereafter" . . . "authorized or prescribed;" and therefore that they became and were subject to the express power of removal under Section IX Clause 9, above quoted.

Many cases from other jurisdictions are cited on behalf of the petitioner; but they have to do with a variety of local statutes, and discussion of them in detail is unnecessary, in view of the fact that none of them in any way affects what we consider to be the plain construction of our own statutes; nor is any case cited wherein it is held that a power of removal expressly delegated to municipal authority may not be lawfully exercised even where an officer, such as a chief of police, a policeman, a police commissioner, or a city marshal, deemed for certain purposes to be a state or public

officer, appointed in accordance with a State law and whose duties are strictly defined by such law, is nevertheless by express terms of a city charter removable upon proper proceedings before a municipal body such as a town council, a board of aldermen or a city council. See *Lowrey v. Mayor, etc., of Central Falls*, 23 R. I. 354; *Norton v. Adams*, 24 R. I. 97; *Andrews v. King*, 77 Me. 224, 231.

As to the distinction between local officers of a town or city or other local subdivision of the State, and state officers subject to impeachment under the constitution, see *Lowrey v. Mayor, etc., of Central Falls*, 23 R. I. 354; *Opinion of Judges*, 167 Mass. 599; *Ex parte Wiley*, 54 Ala. 226, 228; *State ex rel. Holmes v. Dillon*, 90 Mo. 229, 233; *State ex rel. Hitchcock v. Hewitt et al.*, 3 So. Dak. 187, 197; *State ex rel. Stearns v. Smith*, 6 Wash. 496-498; wherefrom it clearly appears that officers of the class to which the petitioner belongs are not subject to impeachment under our constitution or under similar constitutions in other states.

But the petitioner contends that he is not subject to the power of removal vested by the charter in the city council, because the statute, which creates his office (See Gen. Laws, 1909, Chap. 173, § 9), provides that the inspector who appoints him may at any time revoke his appointment; and petitioner thereupon claims that such power of revocation is exclusive of all other methods of removal. The argument in support of this position is not convincing; no cases are cited which in anywise support it. The power of revocation given to the inspector is solely for his benefit so that he can at any time dismiss his assistant without being obliged to assign any cause or give any hearing; it might be simply because they had ceased to be harmonious, or the collector had become personally disagreeable to the inspector, without in any way failing to perform the duties required by law. But this power of revocation or dismissal is in no way inconsistent or in conflict with or exclusive of the power of removal for cause vested in the city council. On the contrary the very reasons why the inspector might

wish to retain his collector in office might furnish the basis of charges leading up to his removal for cause by the city council.

Having thus far determined that the city council had power and jurisdiction to remove the petitioner "for misconduct or incapacity" the question next arises whether the city council could suspend the petitioner from office pending the investigation of charges against him. It has already been shown that the charges preferred against the petitioner were of a very serious character, sufficient, if proved, to warrant his dismissal from office.

It is contended for the petitioner that no such power of suspension, pending charges, existed, and in support of such contention he cites from Throop, Public Officers, p. 394, Sec. 404, as follows: "The weight of authority in this country sustains the doctrine, that the power to suspend an officer does not follow from the grant of power to remove him." But the cases cited in support of this proposition in Throop, and cited also on petitioner's brief, fall far short of establishing any such general proposition.

The case of *State* v. *Jersey City* (I Dutch.) 25 N. J. Law, 536, is not in point here. In that case the common council had power by charter to expel a member for disorderly conduct, and it was held that receiving bribes for his official influence and votes was disorderly conduct on the part of a member, within the meaning of the charter. It appeared that the relator (in a motion for mandamus) after a hearing before the common council had been found guilty on charges of bribery and corruption and had been removed from office; that a new election had been ordered; that he had been reëlected and sworn in according to law; and that upon his appearing and taking his seat in the common council that body passed a resolution directing that the president should not appoint the relator on any committee, that the clerk should not call his name among the list of members on any action, vote or proceeding, and that he (the relator) should not be allowed to take any part in any debate on

any question before the board. It was held that his original conviction and expulsion was proper; but that it did not disqualify him from reëlection; that if reëlected, he could not be expelled a second time for the same offence, the council by its expulsion having exhausted its power under the charter; that being reëlected and in office, there was no warrant for such suspension as was attempted under the resolution; on p. 544, the court said: "It only remains to be considered, whether the action of the common council in resolving that 'the president of council be directed not to appoint Tyrrell on any committee, and that the clerk do not call his name among the list of members in any action, vote, or proceeding of the council, and that he be not allowed to take part in any debate on any question which may come before the board of aldermen,' is warranted by law. We think it entirely clear that it is not. This proceeding amounts to a suspension of the relator from the exercise of his official duties, as a member of that body. It leaves his constituents unrepresented and without remedy. Expulsion creates a vacancy that can be supplied by a new election. Suspension from the duties of the office creates no vacancy; the seat is filled, but the occupant is silenced. The charter vests no such power in the council; it would be extraordinary if it did. The power is to expel, not to suspend."

We have quoted this case at some length because it has often been cited (as in this case) to the general proposition that the power to expel does not include or imply a power to suspend. It is not an authority to that effect. The extent of its authority is, in strictness, that the council had exhausted its power of expulsion, that it had no power to expel at the time when it attempted to suspend, and that the suspension would result in leaving a political constituency unrepresented and without remedy. It does not go to the extent of saying that a suspension, pending charges and while the right to expel still existed, would not be proper.

The case of *Gregory* v. *Mayor, etc.,* 113 N. Y. 416, also fails to support the petitioner's contention. There the

plaintiff was an inspector of excise employed by the commissioners of excise; they had full power to remove him at their own pleasure, without charges; they did attempt to suspend him without pay, and he tendered his services from time to time and finally sued for his salary. It was held that the power to remove from office does not necessarily and in all cases include the power to suspend; that the suspension in this case was improper in view of the duties required; that the inspector should have been removed; and that, he was entitled to recover his pay. The court says, p. 420: "We do not go to the extent of saying that in no conceivable case can the power to suspend be inferred from a grant of the power to remove. There may be cases where such an inference, arising from the general scope and nature of the act granting the power, would be so strong as to compel recognition. We think there is no such inference to be drawn in the case before us." The case of *Metsker* v. *Neally,* 41 Kan. 122, likewise does not support the petitioner. There the mayor attempted to suspend the city engineer, and the city marshal, acting in concert with the mayor, forcibly deprived the petitioner of his office room, books, etc. It was found that the mayor had no power to remove the city engineer from office, and that the power to remove rested in the mayor and council; that therefore the mayor could neither remove nor suspend. The court says, on p. 123: "We can readily believe that the greater power to amove might include the lesser one to suspend, but we have failed to notice any instance where the power to amove is not conceded that the authority to suspend is admitted. In this instance the plaintiff was not suspended pending any examination of charges against him, which if found true would have been grounds for a removal; but he was suspended without charges against him, and without notice."

Some other cases cited for petitioner apparently upon this point have no bearing.

We find a more comprehensive and discriminating statement of the law upon this point in 29 Cyc. p. 1405, as

follows: "Where no express power to suspend has been granted, the courts do not recognize that the power is included within the arbitrary power to remove, for the exercise of the power to suspend will produce an interregnum in office. The ends of discipline in such a case may be sufficiently subserved by the exercise of the power of removal, and do not require the recognition of a power to suspend. But where the power of removal is limited to cause, the power to suspend, made use of as a disciplinary power pending charges, is regarded as included within the power of removal."

The earlier portion of the above statement refers by note to the cases last above cited; while the last sentence is supported by the cases next referred to.

In *State* v. *Police Commissioners*, 16 Mo. App. 48, 50, the court held that the commissioners had authority pending a trial on charges to suspend the chief of police, saying, p. 50: "The suspension of an officer, pending his trial for misconduct, so as to tie his hands for the time being, seems to be universally accepted as a fair, salutary, and often necessary incident of the situation. His retention, at such a time, of all the advantages and opportunities afforded by official position may enable and encourage him, not only to persist in the rebellious practices complained of, but also to seriously embarrass his triers· in their approaches to the ends of justice. In the absence of any express limitation to the contrary, and none has been shown, we are of opinion that, in cases where guiltiness of the offence charged will involve a dismissal from office, there is, on general principles, no arbitrary or improper exercise of a supervisory authority in a suspension of the accused pending his trial in due and proper form."

In *State* v. *Megaarden*, 85 Minn. 41, where it was found that the governor had express power to remove a sheriff for malfeasance or nonfeasance, it was held that the governor had an implied power to suspend pending the hearing of charges. The court quotes with hearty approval the

language above quoted from 16 Mo. App. 50; and the same was again approved in *Blackwell* v. *City of Thayer*, 101 Mo. App. 661, 665. See, also, *Bringgold* v. *Spokane*, 27 Wash. 202, 208; *Maben* v. *Rosser*, 24 Okla. 588, 607; *Shannon* v. *Portsmouth*, 54 N. H. 183.

In view of these authorities and of the nature and circumstances of the case at bar, and in view also of the express power of removal conferred upon the city council, we are clearly of the opinion that said city council had the power to suspend the petitioner pending the investigation of the charges against him, and that such suspension was within its jurisdiction.

(3)    The final question for our determination is whether or not the city council has taken the proper procedure for the removal of the petitioner. It appears from a record of proceedings which is certified by the city clerk and is before us upon the petition for a writ of certiorari, that prior to June 30, 1913, some investigation of the milk department had been made by the aldermanic committee on milk upon certain complaints and that a report thereof was made to the board of aldermen by the committee on milk recommending the formulation of charges and the appointment of a joint special committee to try the questions involved; consequent upon this report and recommendation, which was received and approved by the board of aldermen, June 30, 1913, special meetings of both branches of the city council were duly called by the mayor and were held July 8, 1913, at which time the several joint resolutions herein set forth suspending Scott, the inspector, and the petitioner, and appointing a joint special committee for the investigation of the charges presented against them were duly passed in concurrence and approved by the mayor. It further appears that this joint special committee of investigation, after due notice to the petitioner and other parties in interest, met as directed by the resolution, on July 14, 1913, and, after being duly organized, proceeded with their duties; and that the petitioner and other parties in interest were

present and were represented by counsel; that said committee proceeded to hear testimony relative to the charges both in support thereof and in defence thereto, and continued to hear such testimony at forty successive hearings until October 14, 1913, when the testimony was closed; that the petitioner was given full opportunity to present all such testimony in his defence as he saw fit to introduce (and there was a great deal of it); that after the close of the testimony full opportunity was given at three successive hearings for the argument of counsel, and that the petitioner's counsel was fully heard; that thereafter the committee took much time for consideration and finally reported fully to the city council, accompanying the report with a transcript of all the proceedings and the evidence, and its findings thereon, and its recommendations, in accordance with the resolution of appointment. They found the petitioner not guilty of the first four charges of misconduct with certain specifications of negligence and inefficiency, for the reason that, while they believed that the facts enumerated were proved, they did not believe that he was the person who should be held responsible therefor; and they found him guilty of the remaining charges involving graft and corrupt conduct in office, and recommended his removal for misconduct. This report was presented to a special meeting of the common council duly called and held for the special purpose of receiving the report, on December 26, 1913, at which thirty-six members were present; the report with the accompanying transcript of the testimony and exhibits was presented, the report was read and the same, with the transcript of testimony and the exhibit evidence, was ordered to be communicated to the board of aldermen; and the resolution above set forth requiring the petitioner to appear before the city council on December 30, 1913, to show cause why he should not be removed from office was duly passed, the roll call showing thirty-six members voting in the affirmative and none in the negative.

The board of aldermen on the same day met in special meeting duly called and held for the same purpose, the mayor and all of the aldermen (10) being present, the said report with the transcript of evidence and exhibits, being duly communicated to the board from the common council, was upon motion received by the board and the report was read by the clerk. The board then passed in concurrence the resolution requiring the petitioner to appear before the city council on December 30, 1913, as hereinbefore set forth, to show cause why he should not be removed from office, the roll call showing ten votes in the affirmative and none in the negative. Both the common council and the board of aldermen adjourned to meet on Tuesday, December 30, 1913, at 6:45 o'clock P. M. It appears that the city sergeant duly served upon the petitioner a copy of said report and of said resolution on December 27, 1913. It further appears that the petitioner having filed his written protest as set forth in his petition, the same was presented to the common council at its meeting of December 30th, and was read and received and ordered communicated to the board of aldermen; that said protest was thereupon communicated to said board, and was there read and received; that both branches of said city council met according to adjournment on December 30th; that they went into convention for the purpose of hearing said petitioner and Walter O. Scott, inspector of milk, in accordance with said resolutions of December 26th; that the convention met at seven o'clock P. M., in the chamber of the common council, the time and place provided in said resolution for the purpose of hearing said petitioner and said Scott; that there was present the mayor and ten aldermen, being the entire board of aldermen, and thirty-six members of the common council out of a total number of thirty-eight, being much more than "two-thirds of the members elected;" that the mayor, as presiding officer of said convention, after the clerk had read the resolution requiring the appearance of said Chace and Scott to show cause, etc., inquired if said

Chace or his counsel or Scott or his counsel were present and ready to proceed; and it appears that they failed to respond, and that some time was allowed to elapse awaiting their appearance; that they or either of them did not appear and the joint session at 7:15 P. M., dissolved; the board of aldermen then reassembled in session in its own chamber, and the common council reassembled in session in its chamber; whereupon the joint resolution last above quoted finding said Chace guilty of certain misconduct and removing him from his said office was presented to the common council and was read and passed, there being present thirty-five members out of a total of thirty-eight, all of said thirty-five voting in the affirmative, and none voting in the negative, it thus appearing that more than two-thirds of the members elected voted in the affirmative; the said resolution was then forthwith communicated to the board of aldermen, then in session, the mayor and all of the aldermen (10) being present, and said resolution was passed in concurrence, all of the aldermen voting in the affirmative, it thus appearing that more than the required two-thirds voted in the affirmative, and none in the negative.  No question is raised by the petitioner as to the regularity of any of the meetings or of the proceedings at such meetings of either branch of the city council, or of the convention; and so far as the record before us discloses they all appear to have been regular and lawful meetings.

But the petitioner strenuously contends that he was tried before a committee; that he was found guilty by the committee; that the city council simply accepted the report of the committee, and acted thereon without any evidence being placed before it; that no evidence was taken before the city council itself; that he had the right to have the witnesses for and against him produced and examined before the city council itself, or at least before two-thirds of the members; that the city council had no power to delegate to a committee composed of some of its members its powers to try and convict him and to remove him from office; and, therefore,

that the action of the city council in finally removing him from office was taken without any lawful hearing and was null and void.

There was no delegation of power to the committee to try and sentence the petitioner; the resolution appointing the committee defined its powers, as follows: "Said joint special committee shall hear and receive the evidence presented in support of and against the accompanying charges against two officers of the milk department of the city, namely, Walter O. Scott, Inspector of Milk, and Baylies R. Chace, Collector of Samples, which charges, as recommended by the committee on milk to the board of aldermen, have been formulated by the law department; and said joint special committee shall cause said evidence to be taken stenographically, transcribed and with any documentary, book or other exhibit evidence in any form received by said committee to be filed with either branch of the city council, and therewith said committee shall submit to the city council its report relative to such charges and evidence, its findings thereon and its recommendations, for such further action as the city council may determine. Said committee may cause the transcribed evidence to be printed, and printed copies thereof to be also filed as aforesaid for the use of the city council, and may make its report in print."

The record, already briefly recited, shows that the committee explicitly obeyed these directions, had the testimony taken stenographically by sworn stenographers and transcribed, and that all this evidence so transcribed was submitted to both branches of the city council with the committee's report; that both the original transcript and printed copies thereof had for four days been before the city council as a whole at the time (December 30th) when its meeting in joint session was held for the purpose of giving the petitioner a hearing and when he failed and refused to appear and to avail himself of the opportunity; and the final joint resolution of the city council passed in concurrence December

30, 1913, after such joint session and petitioner's failure to appear, recites "That *after considering the evidence presented* relative to the charges against Baylies R. Chace, Collector of Samples of Milk, accompanying joint resolution of the city council No. 281, approved July 8, 1913, the city council finds," etc., as hereinabove fully set forth. The only powers of the committee were to hear evidence and report its findings and recommendations, "for such further action as the city council may determine." The petitioner was entitled to be heard before the city council as a whole upon all the evidence before them; the city council gave him the opportunity to be heard, he refused on the ground that they had no jurisdiction over him. It is not for us to assume that the city council would not have given him a full and fair hearing; nor can we assume as the petitioner urges us to do that the members did not fully and fairly consider the evidence as it was their duty to do, and as they had full opportunity to do, and as the recital in the final resolution of removal shows that they did. If the petitioner had desired to insist that the members should more fully consider the evidence before them, he had opportunity, by himself or his counsel, to have argued at length thereon and to have called their attention to any and all parts thereof in detail as he did at the final hearings before the committee.

As to the contention of the petitioner that all of the witnesses should have been produced and all of the evidence should have been taken in presence of the entire city council as a body, we find no ground either in reason or authority to support such contention. It is quite customary in all kinds of investigation of matters to be finally acted upon by legislative bodies, that committees of investigation are appointed to receive evidence and to report the same to the legislative body for its action thereon.

Thus, in 2 McQuillin, Municipal Corporations, p. 1351, § 615 (McQuillin Municipal Ordinances, § 123): "Provision is usually made in the organic law of the corporation, or

by ordinance or other regulations, duly adopted in pursuance thereof, for the creation and constitution of committees, to assist the legislative body in the performance of its proper duties, as in the collection of facts and information which are generally embodied in reports. This method of performing portions of the public business is not forbidden and has often been sanctioned by judicial decisions. The rule appears to be well established that certain municipal duties may be performed by agents or committees. Thus, the council may refer applications for the location or alteration of streets to a committee to examine into the matter and report to the council. So, where the council is the sole judge of the election of its own members, upon the institution of a contest, a committee may be appointed to take testimony and report to the council."

Again, in Throop on Public Officers, § 385: "Rights of accused at trial or hearing. As we have already shown, where the statute requires, expressly or impliedly, a hearing or trial, as distinguished from a mere 'explanation,' the charges must be proven by testimony, and the accused has the right to cross-examine the witnesses produced to sustain them, to produce witnesses in his defence, and to be assisted by counsel. It is not essential, that the testimony should be taken before all or a quorum of the members of the board, which is to act upon it; it may be taken by a stenographer, in the presence and under the direction of one of the members, and afterwards written out and submitted to the board, so as to form the basis of the judgment of the board; and the validity of the removal is not affected by the fact that the member, under whose direction it was taken, was not present, when it was so submitted and acted upon by the board; or that he had then ceased to be a member of the board."

Again in Section 393, Throop says: "And the corporation can lawfully appoint a committee to examine into the complaint, and to receive evidence and report thereupon and may remove the officer upon the report and evidence."

Cooley's Constitutional Limitations, 6th ed. p. 161: "Each house must also be allowed to proceed in its own way in the collection of such information as may seem important to a proper discharge of its functions, and whenever it is deemed desirable that witnesses should be examined, the power and authority to do so is very properly referred to a committee, with any such powers short of final legislative or judicial action as may seem necessary or expedient in the particular case."

And it is not because, in all cases, there is a definite statute or ordinance, expressly authorizing the reference to a committee in the particular instance under discussion but many of the decisions rest upon the ground of general convenience or expediency in the practical conduct of matters cognizable by legislative bodies.

In *State ex rel. Salmon* v. *Haynes,* 50 N. J. L. 97, involving an election contest where the common council of Newark was sole judge of the election of its members, the court says (p. 99): "The mayor first contends that the common council had no authority to appoint the committee, or to empower them to do the acts comprised in the resolution which authorized them to expend money for a stenographer. The common council, by the charter, is made the sole judge of the election, returns and qualifications of its members. They were thus required to adjudicate upon the contest raised by O'Connor's petition. The duty of making that adjudication could not be delegated to any committee. But that is not what the common council did in this case. The duty imposed on the committee was simply to take testimony, and to report the facts they found, with the testimony taken. This is the well-known course of proceeding in every body having power to judge of the election of its own members, in case an election is contested. No other course seems practicable, and no injury is thereby done to the contestants, for the adjudication is made, upon the facts and testimony presented, by the whole body. In my judgment, the authority to appoint the committee,

and to direct it to do the acts required by the resolution was clear."

We see no reason why the procedure of reference to a committee to take testimony and report the facts approved in the last quoted case in the matter of a contested election of a member, is not equally applicable upon principle in the case at bar.

Few cases are cited by either party to the case at bar which directly apply to the point here under discussion, and such has been the diligence of counsel that we presume they have cited all they could find. The case most nearly covering this disputed point is that of *Osgood* v. *Nelson*, 41 L. J. Q. B. (N. S. 1872) 329, a final decision by the House of Lords and a leading English case; where it appeared that by virtue of a certain act of Parliament the chief clerk of the London (City) Small Debts Court was to be appointed by the mayor, aldermen and commons; and it was lawful for them, in case of the clerk's inability or misbehaviour, or for any other cause which might appear reasonable to them, the mayor, aldermen, and commons, to remove such clerk. Upon charges of misconduct in office against said clerk, which were brought before that body, elsewhere in the opinion called the "Court of Common Council," the matter was referred to a committee for them to inquire into it and report upon it. The committee gave several hearings at which all parties in interest were present, heard the testimony of all the witnesses who were produced, had the same stenographically taken and heard arguments of counsel; the transcript of the evidence and proceedings was before the committee and was carefully considered; and the committee reported to the council that they found the clerk guilty as charged. The evidence taken before the committee was printed and distributed to the members of the council, the report with transcript of evidence was duly filed and the accused clerk was duly notified and furnished with a copy of the report and allowed to inspect and take copies of the evidence, and he was ordered to show cause on a certain

fixed date before the Court of Common Council (equivalent to our city council) why he should not be removed from office. Further time was given at his request, he finally appeared by counsel and was heard; and thereupon after deliberation, the following resolutions were passed: ·

"Resolved, that in the opinion of this court the duties of chief clerk or registrar of the Sheriffs' Court have not been properly discharged by Mr. Osgood.

"Resolved, that this court having carefully considered the evidence as to the manner in which the duties of the office of chief clerk or registrar of the Sheriffs' Court, have been discharged by Mr. Osgood, is of opinion that reasonable cause exists for his removal from his said office, and this court doth hereby remove him accordingly."

Among other questions raised and determined, which need not be here stated, substantially the same point, now under consideration in the case at bar, was raised, viz.: that the power of amotion had not been properly exercised because the inquiry had been conducted before a small portion of the corporation, and the corporation was not entitled· to delegate to a select body, such as the clerk's committee, the authority conferred upon them, (p. 333); in the earlier stages of this case this contention was overruled in the Court of Queen's Bench (p. 334 by Cockburn, C. J.); in the Exchequer Chamber the judgment of the Court of Queen's Bench was affirmed; on error to the House of Lords, judgment of the Exchequer Chamber was affirmed. Upon the point here under discussion, the House of Lords speaking through Martin, B., said, p. 335: "The next objection taken was that amotion did not take place, as the law required, on the authority of the lord mayor, aldermen and commons, but by delegation. Now, in our opinion, there was no delegation at all—nothing of the kind. What was done was, that a complaint having been made to the body which had control in the matter, viz.: the mayor, aldermen and commons of the city of London, as to the conduct of Mr. Osgood, it was referred by them to a com-

mittee, which seems to have been long used in the Corporation of London, known as the 'Officers' and Clerks' Committee;' and what they were directed to do was to make enquiry, with reference to the alleged complaint, to take evidence and to ascertain the truth of it, not for the purpose of that committee coming to any judgment or decision themselves, but for the purpose of their report being submitted to the mayor, aldermen and commons, in order that they might come to a judgment upon it. The argument of the learned counsel is erroneous in point of fact. That has not taken place which they allege to have taken place, and therefore there was no delegation."

And p. 340, Lord Colonsay says: "I quite agree with the observation made by the learned Baron, that there was no violation of the rule of delegation in this case. The mode adopted was the mode in which such enquiries are ordinarily considered, and necessarily conducted by such a tribunal. What was the course which was stated to have been requisite? It was that after this committee had made their report, if they did make such a report, there should have been an assembling of the common council, there should have been a prosecutor appointed, and there should have been a new trial, with all the formalities of a criminal trial, before they could have arrived at a conclusion. But the committee of enquiry into this matter, having made their enquiry in the ordinary way, having collected their evidence in the ordinary way, and allowed the party who had been present at the collecting of that evidence, to state his case by counsel, I cannot conceive a more fair mode of proceeding."

The criticism of the case of *Osgood* v. *Nelson, supra,* which has been attempted by petitioner's counsel, that it is of no weight as authority here, because the power of the Court of Common Council of London to remove officers may have been derived from prescription or custom or other obscure source is not warranted by the facts; since it clearly appears at large in the opinions, that its powers of amotion were derived from express statutory authority; and its

procedure was fully approved as having afforded a full and fair opportunity to the officer charged with misconduct to be heard in his defence.

Certain other cases are cited on behalf of the respondents, relating to certain rules of police commissions in New York City, where by such rules, adopted by the commissioners under their general discretionary powers to adopt rules for the conduct of the police department, it was provided that upon charges made against a member of the police, testimony might be taken before one commissioner or a deputy, and reported to the commissioner or board of commissioners, who should thereupon give a hearing to the accused party, and who alone could convict and punish. It has been frequently held that such rules were a proper exercise of discretion vested in the commissioners under the law, and that the evidence so taken before one commissioner could properly be submitted to and considered and acted upon by the full board of commissioners, although the witnesses were not produced before them. See *People* v. *Board,* 93 N. Y. 97, 103; *People* v. *Board,* 98 N. Y. 332, 335; *People Board,* 99 N. Y. 676; *People* v. *Greene,* 183 N. Y. 483, 486.

We cite these cases simply to show that it has been found to be a reasonable rule, in relation to inquiries by a board of public officials, into charges of misconduct, that the evidence may be taken before one of such officials and reported to the board for their action; and that it is not the right of the accused person under such circumstances, that all of the witnesses must be examined before the full board. Such a recognition of what is reasonable in such cases, is of some weight in determining whether the petitioner in this case has had a fair opportunity to be heard in his defence.

We find no case cited on behalf of petitioner which supports his contention upon this point.

In *City of Jacksonville* v. *Allen,* 25 Ill. App. 54, the procedure seems to be substantially the same as in the case at bar up to the time that the officer under investigation was

notified to be present at a meeting of the city council if he saw fit and be heard in his defence. The case shows that he did appear and was not given the opportunity which the notice to appear offered him. It was the failure of the council to give him this opportunity which was the deciding factor in the case. The court expressly makes this the issue, at page 56: "That issue, strictly speaking, was whether the appellee was discharged without a hearing before the city council, and this leads to a statement of the real matter in controversy, which is whether the city council has power to discharge a regular policeman without giving him an opportunity to be heard in his defence." The test in this case is not, did the council in person take the testimony against the officer under investigation but, did the officer under investigation have an opportunity to be heard by the council in his defence.

In *Chicago* v. *People*, 210 Ill. 84, a trial board was expressly provided by statute. The trial was held before a board improperly constituted. This was of course illegal. The case also shows that the relator was not given an opportunity to be heard in his defence. The case has no bearing upon the question now under discussion.

In *Andrews* v. *King*, 77 Me. 224, the irregularities upon which the court bases its decision were that the charter required that the hearing be by the mayor and aldermen; that the hearing was held by the aldermen alone without the mayor and was not according to law; it also appeared that there was no determination or judgment upon the facts before sentence was passed. No hearing was had before a committee and the question here under discussion was not raised.

*Charles* v. *City of Hoboken*, 27 N. J. L. 203, is simply an authority to the same effect that if the power of removal is vested in the mayor and council, it may not be exercised by the council alone.

*People* v. *Hamilton*, 82 N. Y. Supp. 884, involved the attempted removal of a docket comparing clerk in the office

of the county clerk of New York County.   The proceedings for removal were taken under statutory authority before a deputy clerk who heard the evidence and himself had power to remove.   He reported the evidence to the county clerk, who had not heard the witnesses; and who made an order of removal without notice to the accused and without giving him any opportunity to be heard.   The removal was held to be illegal on grounds which have no special bearing here.   It was held that the deputy clerk who heard the evidence should have acted in the matter of removal.

No case in this state has passed directly upon this question. In *Maroney* v. *City Council of Pawtucket*, 19 R. I. 3, it appeared that charges of misconduct having been made against the petitioner, an assessor of taxes of the city of Pawtucket, the city council appointed a committee "to give a full, fair and impartial hearing to all parties in interest and to report to the city council the results of such hearing." The committee made a report to the city council and the testimony taken by the committee was read to the board of aldermen and common council assembled in joint convention.   On the same day the city council passed a vote finding the petitioner guilty of misconduct in office and removing him from his office.   Under the charter of the city of Pawtucket, "The city council may by concurrent vote of three-fifths of the members elected to each board remove from office for incapacity or misconduct any officer elected or appointed by them."   The court said:   "Though notice was given to the petitioner of the taking of the testimony before the committee of the city council appointed for that purpose, the record does not disclose any notice to him of the proceeding before the council for his removal from office, so that he could be heard on the question of his removal.   Without such opportunity to be heard the proceeding was not such a trial as is contemplated by Clause 7 of the charter of Pawtucket.   For this reason, we are of the opinion that the proceeding must be quashed." It will be noted that the court does not condemn that part

of the procedure which involves the taking of testimony before a committee of the city council, but places its objection to the proceedings solely upon the fact that the petitioner had no opportunity to appear before the council and be heard on the question of his removal after the committee had reported; an opportunity which was given to the petitioner in the case at bar and of which he refused to take advantage.

We are clearly of the opinion that the method of procedure adopted in this case was a reasonable and proper method, on the part of the city council, of gathering the evidence and bringing it before that body for its consideration and determination. It is not to be expected or required that a body like the city council, which has under the charter important legislative and administrative functions in the conduct of the affairs of the city and the members of which are men of business necessarily requiring time for their own affairs, should sit as a whole for the purpose of listening to all the witnesses produced in the course of a protracted investigation of this character; while. it is proper that they should do so, if they see fit, in our opinion, the method of reference to a committee, to take the evidence and report, was an orderly and proper method well calculated to arrive at just results and in fact gave to the petitioner a better opportunity to present all of his evidence and to be heard at length thereon than would have been possible if the whole city council had sat as a body during all of the forty-three hearings. The language of Cockburn, C. J., quoted in the case of *Osgood* v. *Nelson* (*supra*), 41 L. J. Q. B. (N. S. 1872) 329, at p. 333, is quite appropriate in this connection: "It is true that the Court of Common Council did not themselves hear the evidence, but that arose from the circumstances of the case. Where there is a tribunal of some 360 persons, you cannot expect them to sit down altogether whilst a long enquiry of several days goes on. But the facts of the case must be submitted in some way to those who have to decide it; and the evidence having been printed and circu-

lated amongst all the members of the council, we must take it that those gentlemen did not come to the council to discharge so important a function as that of determining on the dismissal from his office of a gentleman like Mr. Osgood without having examined that evidence so submitted to them."

It is contended on behalf of the petitioner that although the respondents have brought before this court the numerous printed volumes of testimony taken before the committee, and which were placed before the members of the city council prior to the time when the petitioner had his opportunity to appear and be heard, such testimony is no part of the record before this court, although certified with the record by the city clerk. It is true that it has been held by this court that, upon proceedings in *certiorari*, the evidence taken before the inferior tribunal forms no part of the record proper and that "the purpose of *certiorari* is to correct errors of law, and not to review findings of fact." *Maroney* v. *City Council of Pawtucket*, 19 R. I. 3; *Smith* v. *Burrillville Town Council*, 19 R. I. 61, 63; and in accordance with these views we have not examined said testimony with any purpose to review findings of fact. But it is apparent from the allegations of the petition that the charges against the petitioner were of a substantial character, and that if they were found to be true they furnished ample ground for the action of the city council in his removal from office for misconduct; and it is further apparent from an examination of the record which does include the report of the committee and all the proceedings before the city council that there was material evidence of a substantial character, in support of the charges, taken before the committee and by them placed before and considered by the city council, upon which the city council was justified in finding the defendant guilty. We have looked into the proceedings so far as to assure ourselves that the city council, in exercising its jurisdiction of removal acted upon serious and substantial grounds, supported by competent evidence, and that there was just and reasonable cause for their

action. *Keenan* v. *Goodwin,* 17 R. I. 649; *O'Brien* v. *Mayor,* 20 R. I. 49; *Osgood* v. *Nelson, supra.* When, after due notice to the petitioner, the city council as a whole met in special session for the express purpose of giving to the petitioner the hearing to which he was entitled under the general principles recognized by all the cases cited, it is to be presumed that they were acting in good faith and that they intended to give him the fullest opportunity to be heard; he might then, if he saw fit, either by counsel or individually have criticised the testimony and pointed out its weaknesses, or mistakes if any; he might have offered material assistance to the members thereof in the examination and consideration of the testimony. If he was not satisfied that they had given all necessary examination to the evidence before them, then was his opportunity to see that they did so, and to place the matter of his defence before them in such light that they would be compelled to give it consideration. But he saw fit to refuse the opportunity, relying upon his general protest denying their jurisdiction; and it is too late for him now to complain of the result. We are not to assume, as the petitioner urges us to do, that the city council did not examine or consider the evidence submitted by the committee; rather, in view of the plain terms of the final resolution, we are to assume that they did consider the evidence in accordance with their duty; and did make their findings in accordance therewith. We are of the opinion that the city council did all that it was legally bound to do in the premises and that no ground exists for any interference with their action.

The appeal from the judgment of the Superior Court denying the writ of *mandamus* (in the first case) is dismissed, the judgment of the Superior Court is affirmed and that case is remanded to the Superior Court for further proceedings.

The petition for a writ of *certiorari* (in the second case) is denied and dismissed.

*Cooney & Cahill,* for petitioner.

*Albert A. Baker,* City Solicitor.

*Elmer S. Chace,* Assistant City Solicitor, for respondent.