HARRY W. VANDERBACH, PROSECUTOR, v. HUDSON COUNTY BOARD OF TAXATION, RESPONDENT.

Decided January 2, 1946.

Before Justices CASE and DONGES.

For the prosecutor, *Maurice C. Brigadier.*

For the respondent, *Eugene T. Sharkey,* Special Assistant Attorney-General.

The opinion of the court was delivered by

CASE, J.   Our earlier decision is in an opinion by the late Mr. Justice Porter reported in 131 *N. J. L.* 491. The case is remanded to us by the Court of Errors and Appeals. 133 *Id.* 126, for further disposition. For other phases of the litigation see *In re Hudson County Board of Taxation,* 128 *Id.* 574; *Vanderbach* v. *Hudson County Board of Taxation,* 130 *Id.* 3, and 130 *Id.* 490.

We understand that the present mandate to the Supreme Court is, in essence, to determine whether the specifications of misconduct laid by the Hudson County Board of Taxation against the prosecutor herein as secretary of the board were

within the pertinent statutory category and were well founded in fact and also to determine the facts and the law bearing upon the preliminary suspension of prosecutor.

The matter had its inception in proceedings had before Governor Edison as a result of which the Governor removed Patrick A. Monahan, George Scheetz, Harry Bischoff and Alexander D. Sullivan, the theretofore existing members of the Hudson County Board of Taxation, and appointed with the confirmation of the Senate, an entirely new board.

Those proceedings were under *R. S.* 54:3-28, which provides:

"A member of a county board of taxation who shall willfully or intentionally fail, neglect or refuse to comply with the constitution or laws of this state relating to the assessment and collection of taxes, or to perform a duty prescribed by this title, may, after a proper hearing, be dismissed by the governor, and his office declared vacant. The governor may thereupon appoint his successor in accordance with the provisions of this chapter."

The constitutionality of a procedure similar to that set up in the statute was sustained by the Court of Errors and Appeals in *McCran* v. *Gaul*, 96 *N. J. L.* 165. The act of the governor in removing the old and appointing the new board was not under challenge at the time of the events herein recounted nor, with the exception hereinafter noted, has it since been. Had the old members of the board chosen, while still in possession, to dispute the legality of the appointment of the new members *certiorari* was available to them, *Murphy* v. *Freeholders of Hudson County*, 92 *Id.* 244; and later, *quo warranto, Murphy* v. *Ellenstein*, 119 *Id.* 159. Instead, they stood by while the tax board offices were blocked against entrance and the records were removed to a vault that was not the usual resting place of the records and that was under the control of the Hudson County Board of Chosen Freeholders and not of the tax board. As Mr. Justice Bodine said in *In re Hudson County Board of Taxation*, 128 *Id.* 574, 587, they (the removed members) were "not in office except by force." Nevertheless force was exercised to the extent that the new members were compelled to obtain court process

to get possession, and this orderly process, resorted to by the new and not by the old members, was the exception above noted. In that proceeding it was held that the new appointees were, *prima facie*, the board; but while the opinion recognized, it did not create that condition. The new members from the time of their appointment were indisputably *prima facie* the board; yet the secretary knowing all things in full detail elected to make common cause with those who flouted that *prima facie* board until a court order left no middle course between surrender and contempt. At the time of the removal of the old, and the appointment of the new, members of the board Harry W. Vanderbach, prosecutor herein, was the secretary of the board. On July 23d, 1942, which was the date of the removal, the Governor issued a writing, called a "directive," signed by him under the great seal of the state, addressed to Vanderbach as secretary, informing the latter of the removal of the old board members, a copy of the order of removal being attached thereto, and directing him to preserve and keep safe the records, property and effects of the board where the said records and effects then were (the office of the Hudson County Board of Taxation in the court house of Hudson County), to see to it that no unauthorized person or persons had access to such records, property and effects or to the offices of the board, to carry on such routine duties as were necessary for the proper functioning of the office until the new members of the board should take office and then to turn over to the newly appointed members of the board all the said records, property and effects of the Hudson County Board of Taxation intact and in proper condition. For the purposes of this decision we are assuming that the directive—of which we shall say more presently—thus formally delivered to Vanderbach did not bind him to further obligations than he was already under and did no more than to emphasize, with such emphasis as attends a formal document from the Governor of a sovereign state delivered in person by the Secretary of State, the fact that a matter of great importance to the public generally was pending and that Vanderbach was expected to be circumspect and to do his full duty with respect thereto. We

consider that the event served to put Vanderbach on notice that the matter was one of grave moment in which allegiance should be had by him to the board of which he was the secretary and not to individuals, friends or political benefactors.

On the afternoon of July 23d, about three-thirty or four o'clock, in Vanderbach's presence and after he had received the above mentioned communication from the Governor, and so, of course, after he knew of the removals and of the appointments and had been apprised of his duty with respect thereto, the public records of the board were taken from their place in the Hudson County Tax Board offices to a vault in the offices of the Board of Chosen Freeholders, elsewhere in the building. It is the testimony of Irving Eisenberg, an attorney and counselor-at-law of this state, that upon information coming to him that the records were being moved he went to the offices of the board and found the employees of the board busily engaged in the moving operations, that none of the old members of the Board of Taxation were there, that the witness complained to Vanderbach against the removal of the records, whereupon Vanderbach replied that he was removing them but was doing so under the instructions of the county counsel. Also, there was testimony otherwise; but in this connection it is to be observed that there was no contradiction from Vanderbach of this or of any testimony, no explanation from his lips of any of the acts done by or imputed to him, no regrets for the past and no promises for the future. Not only did he not take the stand in his own behalf; he stubbornly refused to answer questions when called by the board. Twice in the course of the hearing on the charges against him he was called and persistently he remained silent. Among the inquiries put to him and which he refused to answer were whether he professed to be an employee of the board, the date of the last day on which he had performed service as secretary, how long he had been employed as secretary, the number of his daily hours of service, whether he was present in the tax office on July 23d when the records were being removed, whether he participated in or ordered the removal, whether he was present at a meeting of the old members of the board

held that day, whether he had done anything to stop the removal and so forth:—questions that went to vital aspects of his duties and acts as secretary not only in respect of alleged derelictions testified to by Mr. Eisenberg but in respect of others we have yet to mention. Whatever right Vanderbach had to stand mute, he had also the right to speak; and his silence in the face of adverse testimony weighed against him. Further information which prosecutor refused to give was sought by this question: "Did you make any record of the books and records of the Board of Taxation which were removed from the office on the 23d day of July?" It was clearly the right of the board to know whether such a list had been made, and if made, to procure it and check against it to ascertain whether all items shown thereon had been returned; and it was, we conceive, the duty of the prosecutor to make note of all records taken from the rooms in his presence or at his instance. The inference is that no record was made. We reach our finding of fact accordingly, namely, that Vanderbach, after a solemn warning from the Governor that the property of the board should be kept intact in its usual resting place, nevertheless, on the instruction from the county counsel, who, however, was not Vanderbach's superior, became the intermediary in having the employees of the board remove the records elsewhere, and made no notation.

The next day, July 24th, the new members of the tax board were sworn in at the court house, necessarily in a room other than the board rooms, and upon attempting to enter the offices of the board were physically barred from doing so by the county police acting under the directions, and in the presence, of Chief Dolan of that force. Not only were the new board members barred from entrance, members of the public who had business to do in the board's offices were also barred. There was much commotion. An effort was made to get a communication through the barrier of police to Mr. Vanderbach, and the word came back through a police officer that Mr. Vanderbach was not there. We find the fact, on direct proof, to be that Vanderbach was in the office of the board at the time that the new members were being sworn

in and at or about the time they were endeavoring to make entrance into the office of the board and that he hurriedly, in the company of a police officer, took his departure through an unusual exit; and circumstantially we find that he did so, in the protective company of the police officer, to escape the incoming of the new board and the meeting which would inevitably be held and which was held without his attendance.

It is in proof from several witnesses that one Frank Fallon was on the lists as a temporary deputy clerk, with annual salary $2,700, in the office of the Hudson County Board of Taxation but that he habitually was irregular in his attendance at the office and when there did not work full time. Indeed, one witness testified that the only time he saw Fallon in the office was when the latter came to sign for his pay check. It was notorious within the office that Fallon was giving little time to his work. Vanderbach as secretary signed the payrolls, including the name of Fallon as one rendering full time service in his full time job, with the following certification: "I hereby certify from personal knowledge that above services have been performed by employees named for time stated." Vanderbach regularly made that certification for action by the paymaster. The certification was not true as to Fallon, and Vanderbach made no effort to ascertain the fact.

The rooms and records of the tax board were held as in a state of siege against the lawfully constituted members of the board and the public generally from July 24th until August 5th, at which time the possession of the property and records was delivered in accordance with the decision by Mr. Justice Bodine in the *mandamus* proceeding instituted by the members of the new board against the present prosecutor *inter alios*, reported in 128 *N. J. L.* 574, *supra*.

Was prosecutor under any responsibility in that lawless exclusion? Lawless, it clearly was. *R. S.* 54:3–30 directs that in counties of the class of Hudson the records of the county tax board shall be open to the inspection of the public during ordinary business hours. From July 24th to August 5th the public generally and the newly appointed board members in particular were forcibly denied access to the offices by

armed county police—six police officers, two lieutenants and an inspector—on duty constantly in three shifts under the direction and frequently with the attendance of Chief Dolan. Patrick A. Monahan, removed president of the old board, a witness for prosecutor and the only member of the old board to take the stand, professed ignorance of the barrier placed against entrance to the offices and denied responsibility for that course. Chief Dolan testified that he and his men acted under instructions from the county counsel. The county counsel, in his capacity as such, on July 23d, addressed a letter to prosecutor stating that the writer had before him the document sent by the Governor to the secretary and that the communication from the Governor appeared "to be a gesture, without value whatsoever," and that the preservation of the records of the board rested upon the Board of 'Chosen Freeholders and not upon the secretary. It is true that the statute, *R. S.* 54:3–30, required the Board of Chosen Freeholders of the County of Hudson to "provide the county board of taxation with permanent offices for the transaction of its business and the preservation of its records" and the letter from the county counsel quoted so much of the statute; but it did not quote or refer to the sentence that followed immediately thereinafter in the statute, a part of the same paragraph, namely, the above mentioned provision that the records shall be open for the inspection of the public during ordinary business hours; nor did it state the further fact that the Board of Chosen Freeholders had long since performed the duty of providing the county board of taxation with permanent offices for the transaction of its business and the preservation of its records and that the permanent offices so provided were the ones then in use from which immediately thereafter the records were removed and the public was barred. To suggest that the records were in any danger is sheer pretense, unworthy to be presented or entertained by sensible men. The whole business of moving the records and blocking off the offices was a battle measure, indefensible in orderly legal procedure. We find it unnecessary to measure nicely the force of the Governor's letter, which we have already discussed in part; but it was much more than gesture. The

county tax board did not operate under the Board· of Chosen Freeholders and was not a part of the county administration. Definitely and purposefully, it was not. The members of the tax board were appointed by the Governor by and with the consent of the senate. They were paid a salary fixed by statute and were paid it from the state treasury. They were sworn to office by an oath filed in the office of the Secretary of State. They were removable for cause by the Governor. The secretary was an appointee of that board, without the oversight or approval of the freeholders. The freeholders were under the statutory direction of fixing the salary to be paid the secretary under the requirement, however, that the salary should not be less than that of any member of the board; and the salary of the secretary was paid from county funds. But the secretary was in no degree subject to the direction of the Board of Chosen Freeholders or of the county counsel. His allegiance and duty were to a state board, which itself owed its existence and accountability, under uniform laws, to · the state government. The Governor had removed for causes, which we must here take as proved and sufficient, all of the members of that board. The only hold-through officer was the secretary. The Chief Executive, in that crucial situation, burdened as he was with the responsibility of heading the business activities of the state and of guarding as best he could the public interests, forthwith addressed that secretary, informing him of the facts and calling upon him to do his duty. To say that such an executive act, issuing from the head of a sovereign state, is only a gesture, and without value whatsoever, is to belittle the processes of democracy. But prosecutor pursued a course both in the removal of the records and in the maintenance of the offices that was in accordance with the letter of the counsel to a board who and which—that is, counsel and board—had no jurisdiction over him or his superiors and was in flagrant violation of the letter from the head of the state government. One of the findings upon which the Governor removed the old board was this: "It frequently acted upon the orders of and as directed by the officials of Jersey City and thereby abdicated to those officials the board's power and duty to see

that property in that city is properly assessed in accordance with *R. S.* 54:3–13." Prosecutor was appointed to his position by the old board members while they were under the charges which culminated in their dismissal. It may be that his appointment at a time when there was much partisan feeling led him to a sense of loyalty to them as a group of individuals and to those with whom that group affiliated; and that, if so, is understandable. But his allegiance should have been—and this was the sense of the Governor's directive—to his position as secretary. It was his duty to maintain, so far as he could, the offices in the absence of the board members, in accordance with the statutory mandate. He was in charge at those times. We consider that, particularly since there was no direction from the tax board to exclude anyone from entry, it was his duty to remonstrate with those who barred the entrance; and we find that he did not do so. Chief Dolan testified that from July 24th, when he received instructions from the county counsel to keep everyone except employees of the tax board out of the rooms, until August 5th, when, on the issuing of the court order, he took his men off, he never saw the prosecutor. We find in point of law that prosecutor was under a responsibility and in point of fact that he did not perform.

In addition, the inability of the new board members to get beyond the cordon of police to communicate with the secretary, or even to ascertain whether he was there, justifies, in the absence of any appearance, word or overture from the secretary, the inference that the latter was availing himself of that protected seclusion to evade and avoid the then legally constituted board, and to make it impossible for them to ascertain whether he was in fact at the board offices; and we so find.

The charges against prosecutor were eleven in number and were fairly epitomized in the conclusions filed by the board after the hearing as follows (we have inserted parentheses giving the charges their distinctive numbers and specifying the date of a board meeting to accord with the charge):

"Briefly, the charges against Vanderbach allege that (1) he failed, neglected and refused to perform his duties as

secretary; (2) he absented himself from a Board meeting (on July 24th, 1942) without permission; (3) he intentionally evaded Board members and refused to take instructions from them pertaining to his duties as secretary; (4) he conducted Board business upon instructions of unauthorized persons; (5) he permitted official Board records to be removed from the offices and to be placed beyond the control of Board members; (6) he failed to keep a proper inventory of records so removed; (7) he permitted Board offices to be closed to the public during business hours; (8) he absented himself from his duties without permission; (9) he concealed himself in the Board offices, refused to meet with its members and secretly departed from the offices contrary to the wishes and direction of Board members; (10) he aided and abetted in excluding Board members from the offices; and (11) he improperly certified, from his personal knowledge, as to services rendered by employees of the Board when in fact, such services were not rendered, upon which basis salary payments were made by the County Treasurer."

The statutory provisions for removal of the secretary are contained in *R. S.* 54:3–9 and 54:3–10. The ninth section is:

"The secretary shall hold office during good behavior, efficiency and residence in the county where employed, and shall not be removed for political reasons or for any cause other than incapacity, misconduct, nonresidence or disobedience of just rules or regulations established by the county board of taxation."

The portion of the tenth section relevant to the issue is:

"No secretary shall be removed from office except for just cause, as provided in section 54:3–9 of this title, and after a written charge or charges of the cause of complaint shall have been preferred against him * * *."

We find that the charges preferred against prosecutor and upon which he was tried come within the statutory category of inefficiency, incapacity and misconduct, and that he, was not removed for political reasons or for any cause other than the causes named and authorized in the statute. Without amplifying our appraisal of the testimony, we consider that

the general tenor of the proofs is manifested by the citations already given and we find that the charges were well founded.

In addition to the attack upon the judgment of removal it is contended that the resolution of suspension, preliminary to the preferment of charges and trial thereon, was void for lack of power. On August 5th the new board met in regular meeting and "because of the conduct of Harry W. Vanderbach as secretary" suspended him from the office of secretary. The charges were formulated and served on Vanderbach on September 9th, 1942, with notice that the charges would be publicly examined into on September 26th. The hearing was several times adjourned, the first time for the convenience of Vanderbach's counsel, the second time for the convenience of Vanderbach himself, and twice more for reasons that are not apparent; it was actually held on December 2d and December 4th, 1942.

It is apparent that the suspension on August 5th was a temporary detachment, not by way of discipline or punishment, but as preliminary to and integrated with the statutory procedure for removal. That the board conceived the suspension to be such is evidenced by its proceeding to entertain charges leading to removal and fixing an early day for hearing. We have found that the board did have the right to remove prosecutor upon those charges after hearing and proofs as prescribed by statute, and inasmuch as the acts and omissions upon which the charges were founded had all occurred prior to the time of the suspension, we are of the opinion that the board, under the circumstances of the case, had the right to suspend prosecutor over the period reasonably required for the formulating of charges, the serving of them upon the accused, the bringing on of the hearing and the decision of the issue. The greater power includes the less. Inability of a public board to separate an inferior officer or an employee from his duties temporarily and in good faith pending trial could work serious impairment in the public service and is not, we think, to be taken as the legislative intent in all instances. The power of a board so to act where the public interest requires flows impliedly, almost necessarily, from the power specifically granted. We find that the public interest did fairly so require.

The decision of this court in *State* v. *Jersey City,* 25 *N. J. L.* 536, was not upon the present issue. There an alderman elected to the common council of the city was tried on charges of misconduct, found guilty and removed from office. At the public election to choose a successor the removed alderman was elected to succeed himself and after he had been sworn in and taken his seat in the common council that body passed a resolution directing the president of council not to appoint him to any committee, directing the clerk not to call his name in any vote or proceeding and further directing that he be not allowed to take part in any debate. The court held that the expulsion of the offending member did not disqualify him from re-election; that when the council expelled him they had exhausted their power; that the passing of the resolution recited above was a continuing suspension which left the alderman's constituents unrepresented and without remedy; that the seat was filled but the occupant was silenced; that the suspension created no vacancy and therefore called for no election. The conclusion was that the power of council was "to expel, not to suspend;" but the foregoing recital makes clear, we think, that the circumstances there considered bear no resemblance to those with which we are concerned and that the conclusion there reached is not a precedent for our guidance. That the matter so presented and decided is not pertinent on the issue of the right to suspend pending charges was the view of the Supreme Court of Rhode Island which, after reviewing *State* v. *Jersey City, supra,* in *Chace* v. *City Council of Providence,* 36 *R. I.* 331; 89 *Atl. Rep.* 1066, said:

"We have quoted this case at some length because it has often been cited (as in this case) to the general proposition that the power to expel does not include or imply a power to suspend. It is not an authority to that effect. The extent of its authority is, in strictness, that the council had exhausted its power of expulsion, that it had no power to expel at the time when it attempted to suspend, and that the suspension would result in leaving a political constituency unrepresented and without remedy. It does not go to the extent of saying that a suspension, pending charges, and while the right to expel still existed, would not be proper."

Again, *Gregory* v. *Mayor, &c., of the City of New York*, 113 *N. Y.* 416; 21 *N. E. Rep.* 119, dealt with a suspension which, if our understanding of the opinion is correct, was simply a continuing separation of an employee from his job, not related to impending charges for removal. The suspension of the employee was "indefinitely and without pay from the performance of any of his duties." Although the court held that in the particular instance suspension was not within the statutory power to remove, it nevertheless remarked:

"In some instances, of which the above case [viz., *State* v. *Jersey City, supra*] is a good example, the power to suspend would seem to be very different in its nature from the power to remove, and not necessarily a minor power included in the power of expulsion. The rights of a constituency might be affected most deeply by the exercise of the power to suspend, and yet would be, in truth, untouched by the expulsion of an unworthy representative. Whether the power to remove includes the power to suspend must, as it seems to us, depend, among other things, upon the question whether the suspension in the particular case would be an exercise of a power of the same inherent nature as that of removal, and only a minor exercise of such power, or whether it would work such different results that no inference of its existence should be indulged in, based only upon the grant of the specific power to remove. We think it is apparent that the two powers cannot always be properly respectively described as the greater and the less, and consequently it cannot always be determined simply upon that ground that the suspension is valid because there was a power to remove."

The Court of Appeals of Maryland, in *Cull* v. *Wheltle*, 114 *Md.* 58: 78 *Atl. Rep.* 820, held that the power of the governor to remove the members of the board of police commissioners of Baltimore City did not include the right to suspend. The learned opinion cites decisions of various jurisdictions, including our own *State* v. *Jersey City, supra*, but the determination turns upon an intensive study of the constitution and statutes of the State of Maryland without resting upon the views of sister states. Lest we misstate the reliance of the court in reaching its decision we quote:

"What we have already said will relieve us of further reference to authorities cited from other jurisdictions, and, regardless of them, we are of the opinion that, under the constitution and laws of this state, as construed and interpreted by this court:" and then follows the statement of the holdings.

In *Levinson* v. *Mooney,* 128 *N. J. L.* 569, our Supreme Court passed upon resolutions by the mayor and council of the City of Asbury Park removing the city police judge after hearing upon charges and suspending him pending determination of the charges. The court found that the accused had not been accorded a fair trial and voided the attempted removal. It also held that the resolution of suspension was illegal. We think that the opinion of the court was expressed with respect only to the particular statute under which the City of Asbury Park was functioning and was not intended to be, and should not be interpreted as, a general holding that the power to remove upon charges never includes the power to suspend pending charges.

In the instant case the power to suspend is of the same inherent nature as is the expressly given power to remove. It works no different results. It is a minor power, necessary to give full effect to the greater. An examination of the charges carries the assumption, almost as a corollary, that a secretary who is guilty of the misconduct therein alleged ought not, in the public interest, to function during the period, necessarily of some duration, while the statutory preliminaries to a determination of the fact are in progress. The suspension was not by way of punishment and in its intendment and effect was not indefinite. It was in its purpose and out-working a detachment from duty pending trial and decision and it finally merged in the judgment to which it was a preliminary incident. That view has support in *Gregory* v. *City of New York* and *Chace* v. *Providence, supra; Douglas* v. *Megaarden,* 85 *Minn.* 41, and elsewhere; and it is in line with the phrasing of the *quære* in the Court of Errors and Appeals opinion by which this case came down.

We conclude that the resolution of suspension and the judgment of removal should be affirmed and that the writ of *certiorari* should be dismissed, with costs.